Carlos Makoto Taitano, State Bar No. 275820
Taitano & Taitano LLP
P.O. Box 326204
Hagatna, Guam 96932
Telephone:    (671) 777-0581
Email:        cmakototaitano@taitano.us.com

*Attorney for Applicant*
*Felix Yongbok Lee*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Ex Parte* Application of | ) |
| | ) Case Number: |
| Felix Yongbok Lee, | ) |
| | ) **DECLARATION OF KYONGSOK** |
| Applicant. | ) **CHONG IN SUPPORT OF FELIX** |
| | ) **YONGBOK LEE'S *EX PARTE*** |
| | ) **APPLICATION FOR ORDER PURSUANT** |
| | ) **TO 28 U.S.C. § 1782 AUTHORIZING** |
| | ) **DISCOVERY FOR USE IN FOREIGN** |
| | ) **PROCEEDINGS** |
| | ) |
| | ) |

I, Kyongsok Chong, declare that:

1.    I am more than 21 years of age, am competent to testify on the matters stated in this declaration, and, except as may be otherwise stated in this declaration, have personal knowledge of the matters stated in this declaration.

2.    I am an attorney licensed to practice law in the Republic of Korea, and I am the Executive Partner at the LIWU Law Group in Seoul, Republic of Korea.

3.    I have reviewed the subject X posts and relevant law as described in this declaration, and my opinion below is based upon those documents or facts that I have been made aware of.

4.    This declaration is in support of Felix Yongbok Lee's *Ex Parte* Application for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in Foreign Proceedings (hereinafter "**Application**").

*Declaration of Kyongsok Chong*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5.      I was consulted by, and advised, Felix Yongbok Lee (hereinafter "**Applicant**") about filing a civil lawsuit and obtaining evidence for his civil lawsuit against an anonymous individual (hereinafter "**User**") who, using an X account, posted defamatory and insulting posts concerning the Applicant.

6.      According to The San Francisco Standard, X Corp. (hereinafter "**X**") maintains offices in San Jose and Palo Alto, California; attached as **Exhibit 1** is a true and a correct copy of the article published on The San Francisco Standard on August 5, 2024 at https://sfstandard.com/2024/08/05/x-officially-kills-its-san-francisco-headquarters-will-relocate-workers-to-south-bay/.

7.      According to the website of X at https://careers.x.com/en, X offers job positions in San Jose and Palo Alto; attached as **Exhibit 2** is a true and a correct copy of X's website at https://careers.x.com/en, which was saved on August 15, 2025.

8.      The Applicant has filed a civil lawsuit on July 22, 2025 against the User in the Seoul Eastern District Court in the Republic of Korea for defamation and insulting (hereinafter "**Civil Case**").

9.      I am the attorney of record of the Applicant for the Civil Case.

10.     Article 750 of the Civil Act of Korea provides:
**Article 750 (Definition of Torts)**
Any person who causes losses to or inflicts injuries on another person by an unlawful act, intentionally or negligently, shall be bound to make compensation for damages arising therefrom.

Minbeob [Civil Act] art. 750 (S. Kor.).

11.     Article 751 of the Civil Act of Korea provides:

**Article 751 (Compensation for Non-Economic Damages)**
(1) A person who has injured the person, liberty or fame of another or has inflicted any mental anguish to another person shall be liable to make compensation for damages arising therefrom.
(2) The court may order the guilty party to discharge the compensation mentioned in paragraph (1) by periodical payments, and may order such guilty parties to offer reasonable security in order to insure his performance of such obligations.

Minbeob [Civil Act] art. 751 (S. Kor.).

*Declaration of Kyongsok Chong*

12.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, it is my opinion that the elements of a tort under Article 750 are (1) an unlawful act, (2) done intentionally or negligently, (3) an injury, and (4) causation between the unlawful act and the injury.

13.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, it is my opinion that the Applicant has made out a prima facie case; the posts on X by the User meet the elements of the tort of defamation and insulting under Articles 750 and 751 of the Civil Act of the Republic of Korea; and the Civil Case will withstand a motion to dismiss.

14.     The Applicant has been unable to serve the User with legal process in the Civil Case, because the true identity of the User is unknown.

15.     The Applicant by discovery, is seeking personal identifying information (hereinafter "**PII**") of the User in order to identify the true identity of the User to serve the User with legal process.

16.     The Applicant has attempted to but has been unable to identify the true identity of the User, and based upon my experience as an attorney licensed to practice law in the Republic of Korea, it is my opinion that there are no legal procedural means under the laws of the Republic of Korea to identify the true identity of the User because X, which is outside the jurisdiction of the courts of the Republic of Korea, is the only party that has PII of the User.

17.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, it is my opinion that the Applicant will not be able to proceed with the Civil Case without the true identity of the User.

18.     X is not, and will not be, a party or participant to the Civil Case and the information or documents sought through discovery is or are held by X in the United States, and therefore, the information or documents sought through discovery are outside the reach of the jurisdiction of a court in the Republic of Korea.

19.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, I am not aware of any restrictions imposed by, or any policies under, the laws of the Republic of Korea limiting United States federal court judicial assistance for the purposes described herein or in the Application.

*Declaration of Kyongsok Chong*

20.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, civil courts of the Republic of Korea are receptive to assistance in discovery by United States federal courts, including discovery of PII of individuals publishing anonymous online statements.

21.     The Applicant is not attempting to circumvent any foreign proof-gathering restrictions or other policies of the Republic of Korea or the United States of America.

22.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, to proceed with a civil case against a person, the person must be identified and confirmed by his or her name, address, and date of birth, with the address being of less importance as explained below.

23.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, if the Applicant can obtain the name and date of birth of the User through discovery in this case, then the Applicant can obtain a court warrant to obtain the registered address of the User from the local government using the name and date of birth, because every person in Korea is required to register their residential address with the local government.

24.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, with only a name and address, a court may issue a warrant for the local government to disclose the identity of the person; however, the local government will be unable to disclose the registered information of the person if there are multiple individuals in Korea with the same name or if the addresses were misused, incorrect, or do not exist.

25.     Based upon my experience as an attorney licensed to practice law in the Republic of Korea, if the Applicant can obtain the telephone number or bank information (bank name and account) of the User through discovery in this case, then the Applicant can obtain a court warrant to seek the name and the date of birth of the User from the Korean telecommunication company or bank.

26.     The discovery of the telephone number and banking information of the User is not unduly intrusive, because this information is narrowly tailored to discover the true identity of the User, and is not seeking irrelevant information.

*Declaration of Kyongsok Chong*

27.    The reasons that the access log (dates, times, and internet protocol (hereinafter "**IP**") addresses) of the User's X account (hereinafter the "**Recent Access Log**") is necessary, in addition to other PII, to identify the User are:

(a)    When the tortfeasor, the User in this case, accesses the internet to access the X platform, the tortfeasor's electronic device (e.g., laptop or smartphone) initially communicates with an ISP.[1]/ Subsequently, the ISP communicates with a company providing online services (hereinafter the "**Online Service Provider**"), in this case X which maintains the servers upon which the X account of the User is maintained, whereby the tortfeasor is able to access the User's X account.

(b)    In each communication, information such as an IP address and a time stamp (the time when the specific communication occurred), may have been recorded, which records are commonly known as an "access log."

(c)    The ISP assigns an IP address to the tortfeasor when providing the tortfeasor with internet access, and therefore, the ISP is able to identify the tortfeasor using the access log because it has a record of to whom it assigned a certain IP address at a certain time.

(d)    The ISP may assign a different IP address every time that a tortfeasor accesses the internet, and therefore, in order to identify a tortfeasor by using an IP address, the time and the date that the person was accessing the internet using the specific IP address is necessary.

(e)    Initially, a victim of an unlawful act on the internet, such as the Applicant, does not know the ISP of the tortfeasor, and therefore, the victim needs for the Online Service Provider to disclose the access log in its possession, and the Recent Access Log sought by the subpoena is seeking this information from X.

---

[1]/ ISP means Internet Service Provider, and is an entity that provides internet access services to users, and examples of ISPs in the United States are AT&T and Verizon.

*Declaration of Kyongsok Chong*

(f)    By obtaining the IP address from the Online Service Provider, the victim is able to identify the ISP used by the tortfeasor, because IP addresses are owned by ISPs, and the IP addresses owned by an ISP is publicly available information.

(g)    By identifying the ISP used by the tortfeasor, the victim can provide the access log (the IP address and the timestamp) to the ISP and request information such as the name and the address of the tortfeasor from the ISP to identify the tortfeasor in order to serve the tortfeasor with legal process.

(h)    In many cases, the Online Service Provider does not have accurate PII that is sufficient to identify the true identity of the tortfeasor because the Online Service Provider does not require the tortfeasor to record his or her true name, address, e-mail address, telephone number, or any other PII, which information must each be voluntarily provided by the tortfeasor.

(i)    Where the tortfeasor created the X account to damage the reputation of the victim, most of the information obtained about the X account may be fictitious because the PII is voluntary.

(j)    Therefore, in many cases, the access log obtained from the Online Service Provider is the information that will allow the victim to identify the true identity of the tortfeasor.

(k)    Ideally, if the Online Service Provider keeps a complete access log indefinitely, a victim can more readily identify the tortfeasor.

(l)    However, in practice, a sufficient access log is not available because (i) the Online Service Provider does not record a complete access log for all communications, (ii) the Online Service Provider only keeps the access log for a short period of time (usually for three to six months); or, (iii) a tortfeasor can use special anonymization computer programs to prevent the victim from identifying the tortfeasor through the use of the access log.

(m)    Because the access log is deleted by the Online Service Provider after several months, the more recent access log is critical.

*Declaration of Kyongsok Chong*

(n)    The tortfeasor may be accessing the internet and the Online Service Provider using the anonymization computer program at times, but may have the program off at other times.

(o)    For the foregoing reasons, the more recent access log for a reasonable period of time is necessary because (i) the Online Service Provider may have not recorded a complete access log if discovery is limited to a short period of time, (ii) the older access log has likely been deleted, or (iii) there is a possibility that the tortfeasor may have had his or her anonymization computer program turned off.

(p)    If discovery is allowed only for a short period of time, and for only the older access log, for the foregoing reasons, it will be less likely that the victim will be able to obtain information sufficient to identify the true identity of the tortfeasor.

(q)    Therefore, for the foregoing reasons, it is reasonable to allow discovery of the recent access log, and to not limit discovery to the period at or about the time that the posts were published.

28.    In order for the Applicant to identify the User through the ISP using an IP address, both the IP address and the corresponding timestamp is necessary.

29.    Without the corresponding timestamp, an ISP in the Republic of Korea will be unable to pin-point the tortfeasor that was using the IP address at a certain point-in-time.

30.    A timestamp only shows when a person accessed their online account using a specific IP address, and does not disclose what the person was doing using their online account, and therefore, discovery of a timestamp only minimally intrudes upon a person's privacy; the evidentiary value of a timestamp allowing the victim to identify the tortfeasor far outweighs any privacy issues.

31.    Finally, any PII (other than the Recent Access Log) registered, at any time, with the tortfeasor's accounts is necessary, because, based upon my experience as an attorney licensed to practice law in the Republic of Korea, the tortfeasor may have not planned to damage the Applicant until a time near to when the posts were published, and as such, it is more likely that the tortfeasor may have used his or her true identity near to the time when the posts were published.

*Declaration of Kyongsok Chong*

32.     Recent PII is also relevant and necessary, because the User may not have changed PII that is not displayed publicly.

33.     The discovery of PII requested is not unduly intrusive, because this information is narrowly tailored to discover the true identity of the User and is not seeking irrelevant information.

34.     Based upon my experience, where an online account is used for a legitimate purpose, PII is only changed occasionally, and because this information is stored by X in the ordinary course of its business, the burden placed upon X in disclosing this information is minimal.

35.     Based upon the foregoing, the information and documents sought from X is highly relevant and crucial to the Civil Case in the Republic of Korea and are narrowly tailored and limited to the discovery of information necessary to identify the true identity of the User against whom the Civil Case was filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September ___2___, 2025.

_____

KYONGSOK CHONG

*Declaration of Kyongsok Chong*

**Business**

# X officially kills its San Francisco headquarters, will relocate workers to South Bay

The social media giant anchored one of the city's key downtown neighborhoods for more than a decade.



X CEO Linda Yaccarino announced Monday that the company will close its Mid-Market offices "over the next few weeks." | Noah Berger/AP Photo



By **Kevin V. Nguyen** and **Priya Anand**
Published Aug. 05, 2024 • 4:28pm

It is officially the end of an era for Mid-Market. Thirteen years after the city carved out a special tax break to attract tech companies to its beleaguered downtown corridor, X has confirmed plans to shut its San Francisco headquarters.

In an internal email reviewed by The Standard, CEO Linda Yaccarino announced Monday that X will close the offices "over the next few weeks" and will relocate San Francisco-based employees to the South Bay.

Once the move is complete, X's engineering workers will share an office in Palo Alto with xAI, another company owned by Elon Musk, while the remaining employees will be routed to existing offices in Santana Row, San Jose's popular residential, retail and business thoroughfare. The New York Times first reported the news.

**Exhibit 1**

Yaccarino said in the email titled "SF Office Closure" that the company "is actively working on plans, including transportation options, for those directly impacted" but did not say if X will provide shuttle services or commuter benefits.



X CEO Linda Yaccarino informed San Francisco employees via email that they would be transferred to either Palo Alto or San Jose. | Mark Schiefelbein/AP Photo

"This is an important decision that impacts many of you, but it is the right one for our company in the long term," Yaccarino said.

X did not respond to a request for comment.

When the company was acquired by Musk in late 2022, the mercurial tech mogul immediately called all local employees back into the office full time. Sources inside the company, who do not have permission to speak to the media, confirmed that more than half the space at X's headquarters, located at 1355 Market St., is vacant or unused after multiple rounds of layoffs.

**Exhibit 1**

**Major tech companies that have departed Mid-Market**

| Company | Description |
| --- | --- |
| Zendesk | Leased space at 1019 Market St. in 2013, and ended its contract there in 2021. |
| WeWork | Leased the majority of 995 Market in 2015 before abandoning it in 2021. |
| Block | Opted to go remote-first during the pandemic and in 2022 decided against renewing its lease. |
| Reddit | Leased space at 1455 Market in 2019 before decamping last year. |
| Uber | Open its Mid-Market HQ in 2013, but moved to a new office complex in Mission Bay in 2021. |

TABLE: PRIYA ANAND

S

Last month, the company began <u>marketing the offices for sublease</u>. Shortly thereafter, Musk took to the social media platform to <u>announce</u> that X would relocate to Austin, Texas, due to his fury over a California transgender protection law. Yaccarino's email made no mention of that move.

Altogether, X is on the hook for roughly 800,000 square feet of office space at the near-century-old Art Deco building in Mid-Market, with deals that expire in 2026 and 2028.



After acquiring Twitter in late 2022, Elon Musk initiated mass layoffs while ordering local employees back to the office. Last month, he said the company, now known as X, would move to Austin, Texas. | Chesnot/Getty Images

In 2011, <u>the city said</u> it would pause its 1.5% payroll tax for companies that moved into the area for up to six years. Companies would have to pay only their first year's payroll tax, and if headcount swelled later, the tax amount would stay the same. City officials hoped the policy — and Twitter's arrival — would make the area more attractive to other businesses. And to some extent, it did.

**Exhibit 1**

Certain buildings in the area, such as 1455 Market St., were not eligible for the tax break but still attracted tech companies that opted to cluster around other fast-growing startups. Among the businesses that took the tax break, in addition to Twitter, were the dating app Zoosk, the home decor site One Kings Lane and David Sacks' Yammer.

**Related**


**The Mid-Market faithful: Life inside San Francisco's office dead zone**

Twitter — which at the time was threatening to move to Brisbane — became the face and symbol of this incentive to attract companies and construction to the neighborhood.

A city report assessing the impact of the tax break, published in 2014, three years after it took effect, said it was likely "the primary reason for the relatively greater growth of businesses" in that area. In 2013, 15 businesses benefited from the tax break, saving a collective $4.2 million, according to the report. The report estimated that the city raked in $7.1 million more in payroll tax from the area than it would have otherwise, painting the policy as a victory.

However, since the 2019 expiration of the tax breaks and the wide shift to remote work, that exuberance appears firmly in the rearview mirror.

X's latest announcement is yet another nail in the coffin.

Kevin V. Nguyen can be reached at knguyen@sfstandard.com
Priya Anand can be reached at panand@sfstandard.com

**Filed Under**

Business    Commercial Real Estate    Elon Musk    Mid-Market    Twitter

**Read More**

**Sam Altman is amassing a serious compound in Russian Hill**


**Exhibit 1**

Big lease deals show SF companies are committing to the office again



'You could shoot a cannon in there': SF Centre spa owner details why his business died



The NBA (kinda) returns to Roar-acle for one night



How a 113-year-old institution survives the Super Bowl of blossoms



**Popular Today**

**Exhibit 1**

**1** 'It's insane': Trump moves to abolish Presidio Trust through executive order    **2** Here's h

☰Q    The San Francisco Standard    Join Now





**Exhibit 1**

About Us

Staff

Standards & Ethics

Newsletters

RSS Feeds

Jobs

Contact Us

Tips

Advertising Inquiries

Sign In

Membership

Membership FAQs

© The San Francisco Standard. All Rights Reserved.

Terms of Use | Privacy Policy | California Resident Rights | Your Privacy Choices

*Join* **The Standard**

**Exhibit 1**

# Join us to build the future of the internet

We're building the world's most trusted public town square—and we pride ourselves on our commitment to protecting free speech within the boundaries of the law.

Beyond that, we aim to increase unregretted user minutes on our platform, and make it the best place on the internet for creators to share content and make money.

Join us to have real impact on what is bound to evolve into the ultimate everything app.

**Check out our open positions →**

## X Careers

**Job Title**

Exhibit 2

Search

**Team**

- ☐ Corporate Security
- ☐ Engineering
- ☐ Finance
- ☐ Global Ad Sales
- ☐ IT
- ☐ Indirect Sales
- ☐ Indirect Sales - Sales Enablement
- ☐ Legal
- ☐ People
- ☐ Safety
- ☐ Sales

**Location**

- ☐ Atlanta, GA
- ☐ Austin, TX
- ☐ Bastrop, TX
- ☐ Dublin, IE
- ☐ Hamburg, DE
- ☐ Hillsboro, OR
- ☐ London, UK
- ☐ Los Angeles, CA
- ☐ Madrid, ES
- ☐ Manila, PH
- ☐ Miami, FL
- ☐ New York City, NY
- ☑ Palo Alto, CA
- ☑ San Jose, CA
- ☐ Seattle, WA
- ☐ Seoul, KR
- ☐ Singapore, SG
- ☐ Tokyo, JP

**Exhibit 2**

☐ Toronto, CA

**Reset**

**51 of 110 results**

---

# Network Development Engineer – Core & Backbone Teams

Engineering    |    Regular    |    Palo Alto, CA and 3 more locations

# Senior/Staff Security Engineer, Zero Trust & IAM

Engineering    |    Regular    |    Palo Alto, CA and 2 more locations

# Software Engineer – Mobile

Engineering    |    Regular    |    Palo Alto, CA and 4 more locations

# Senior/Staff Security Engineer, Offensive Security

Engineering    |    Regular    |    New York City, NY and 3 more locations

# Software Engineer – Frontend

Engineering    |    Regular    |    Palo Alto, CA and 4 more locations

# Software Engineer – Developer Experience

Engineering    |    Regular    |    Palo Alto, CA and 3 more locations

# Software Engineer – Core Services

Engineering    |    Regular    |    New York City, NY and 2 more locations

# Software Engineer – Observability

Engineering    |    Regular    |    Palo Alto, CA and 3 more locations

**Exhibit 2**

# Software Engineer - Lead Build Engineer

Engineering    |    Regular    |    Palo Alto, CA and 2 more locations

# Software Engineer - Product Infrastructure

Engineering    |    Regular    |    Palo Alto, CA and 1 more location

# Product Operations Manager

Engineering    |    Regular    |    Palo Alto, CA

# Senior/Staff Software Engineer, Security Infrastructure

Engineering    |    Regular    |    Palo Alto, CA and 1 more location

# Software Engineer - Media

Engineering    |    Regular    |    Palo Alto, CA and 2 more locations

# Software Engineer - Storage

Engineering    |    Regular    |    Palo Alto, CA and 2 more locations

# Machine Learning Engineer - Community Notes

Engineering    |    Regular    |    Palo Alto, CA and 3 more locations

# Sourcing Manager

Finance    |    Regular    |    Palo Alto, CA

# Sr. Security Systems Engineer - Corporate Security

Corporate Security    |    Regular    |    Palo Alto, CA and 1 more location

# Paralegal

Legal    |    Regular    |    New York City, NY and 1 more location

**Exhibit 2**

## Operations Manager - Platform Safety & Integrity

Safety  |  Regular  |  Palo Alto, CA and 1 more location

## Procure to Pay Analyst

Finance  |  Regular  |  San Jose, CA

## Safety Agent II

Safety  |  Regular  |  Palo Alto, CA

## Sr. Product Manager, Platform Integrity

Safety  |  Regular  |  Palo Alto, CA

## Client Platform Engineer

IT  |  Regular  |  Palo Alto, CA

## FP&A Analyst

Finance  |  Regular  |  New York City, NY and 1 more location

## Technical Operations- Optimization Manager

Indirect Sales  |  Regular  |  Palo Alto, CA

## Operations Manager - Monetization Integrity

Safety  |  Regular  |  Palo Alto, CA and 1 more location

## Treasury Risk and Liquidity Finance Manager

Finance  |  Regular  |  New York City, NY and 1 more location

## Product Compliance Manager

Legal  |  Regular  |  New York City, NY and 1 more location

## Controls Testing Compliance Manager

Legal  |  Regular  |  New York City, NY and 1 more location

Exhibit 2

# Sr. Security Systems Manager - Corporate Security

Corporate Security   |   Regular   |   Palo Alto, CA and 3 more locations

# IT Asset Management Analyst II

IT   |   Regular   |   Palo Alto, CA

# Software Engineer - X Networking

Engineering   |   Regular   |   Palo Alto, CA and 2 more locations

# Software Engineer - Data Platform

Engineering   |   Regular   |   Palo Alto, CA and 2 more locations

# Sr. Security Engineer

Engineering   |   Regular   |   New York City, NY and 3 more locations

# Sr./Staff Product Designer

Engineering   |   Regular   |   Palo Alto, CA and 1 more location

# Security Engineer Partner

Engineering   |   Regular   |   Palo Alto, CA and 1 more location

# Hardware Systems Engineer

Engineering   |   Regular   |   Austin, TX and 5 more locations

# Site Reliability Engineer - High Performance Computing / AI-ML

Engineering   |   Regular   |   Austin, TX and 4 more locations

# Software Engineer - Applied Safety

Engineering   |   Regular   |   Palo Alto, CA

# Engineering Intern

**Exhibit 2**

Engineering  |  Intern  |  Palo Alto, CA and 1 more location

## Software Engineer – Payments

Engineering  |  Regular  |  Palo Alto, CA and 1 more location

## Safety Data Analyst

Engineering  |  Regular  |  Palo Alto, CA and 1 more location

## Full Stack Software Engineer, Legal Operations

Engineering  |  Regular  |  Palo Alto, CA and 3 more locations

## Performance Engineer (JVM)

Engineering  |  Regular  |  Palo Alto, CA and 1 more location

## Staff Software Engineer – X Developer Platform

Engineering  |  Regular  |  Palo Alto, CA and 1 more location

## Sr Software Engineer – X Developer Platform

Engineering  |  Regular  |  Palo Alto, CA and 1 more location

## Product Analyst

Engineering  |  Regular  |  Palo Alto, CA and 2 more locations

## Sr Policy Specialist, Platform Safety & Integrity

Safety  |  Regular  |  San Jose, CA and 1 more location

## Threat Intelligence Specialist

Safety  |  Regular  |  Palo Alto, CA

## Site Reliability Engineer (SRE) – Multiple Teams

Exhibit 2

Engineering     |     Regular     |     Palo Alto, CA and 3 more locations

# Software Engineer - Infrastructure Foundation

Engineering     |     Regular     |     New York City, NY and 3 more locations

## Don't see the dream job you are looking for?

Drop off your contact information and resume and we will reach out to you if we find the perfect fit!

**Introduce Yourself**

𝕏  ©2025 X Corp.     Cookies     Privacy     Terms and conditions

**Exhibit 2**